UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RAMON RAMOS,

                                Petitioner,

        – versus –

STEVEN RACETTE, Superintendent, Elmira
Correctional Facility,

                                Respondent.

**MEMORANDUM
AND ORDER**

11-CV-1412 (JG)

A P P E A R A N C E S :

        RAMON RAMOS
                #97-A-4743
                Elmira Correctional Facility
                P.O. Box 500
                Elmira, NY 14902-0500
                Petitioner, *Pro Se*

        RICHARD A. BROWN
                Queens County District Attorney
                125-01 Queens Boulevard
                Kew Gardens, NY 11415
        By:     Ellen C. Abbot
                Assistant District Attorney
                *Attorney for Respondent*

JOHN GLEESON, United States District Judge:

        Ramon Ramos, who is currently incarcerated at Elmira Correctional Facility,

petitions this court, *pro se*, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Ramos was

convicted after a jury trial of one count of rape in the first degree, two counts of sodomy in the

first degree, and one count of robbery in the second degree. He was sentenced as a persistent

felony offender to concurrent, indeterminate prison terms of 25 years to life on each conviction.

He now brings this petition for habeas corpus, alleging that his conviction was obtained in

violation of his due process and Sixth Amendment rights, and that his sentence violates his due

process and double jeopardy rights. For the reasons explained below, the petition is denied.

BACKGROUND

A.    *The Offense Conduct*

The facts of the offense were recounted by the victim at Ramos's trial.[1]  On July

8, 1993, the victim, A.V.,[2] then 25 years old, went to visit her friend in the Forest Hills section

of Queens (239-41).  When she entered the elevator of her friend's building, the elevator went to

the basement instead of to the floor she had pressed (245).  There, a man opened the elevator

door and grabbed A.V. and covered her face (246).  He pulled her out by her neck and threatened

to kill her if she made any noise (247).  He took her into a small room in the basement and asked

for any money or valuables she had (248).  She complied and gave him her money (248).  Then

he instructed her not to look at him and he removed her shorts and underwear (250-51).  He put

his penis in her anus, which was very painful (251).  He then put his mouth on her vagina (252).

After that, he put his penis inside her vagina (252-53).  When he stopped, A.V. was crying,

asking "Why, why, why?" and he said he was sorry, and that "I know this is going to scar you

for the rest of your life, but just think of it as just sex that we both enjoyed and had together"

(253-54).  Then he kissed her on her face or head and threw her shorts behind a laundry machine

(254).  He warned her to give him time to leave the building or he would kill her (254).

A.V. then took the elevator up to her friend's apartment and told her friend she

had been raped (256).  Her friend called the police, and A.V. was taken to the hospital by

ambulance (257-58).  At the hospital, A.V. was examined and a sexual assault kit was completed

---

[1]    The trial transcript, which spans 365 pages, is filed at ECF No. 12-3 at 70-168 (pages 1-99), ECF No. 12-4 (pages 100-278), and ECF No. 12-5 at 1-87 (pages 279-365).  I will cite to it by writing the page numbers of the trial transcript in parentheses.  The victim testified on the second day of Ramos's trial.  Her testimony spans pages 238-265 of the trial transcript.

[2]    To protect the identity of the victim, she is referred to in this opinion by only her initials.

(260-61).  Although the police examined the basement where the rape had occurred and dusted for fingerprints, no prints could be found.

Almost nine months later, on March 30, 1994, Ramos was arrested for a burglary in Queens.  At that time, investigators interrogated him about the rape of A.V., as well as two other rapes they believed were related, which had occurred on February 3, 1994, and February 23, 1994[3] (11/28/05 at 19-20[4]).  However, after A.V. was unable to identify Ramos in multiple photo arrays and lineups,[5] the police did not pursue Ramos as a suspect in A.V.'s rape any further (11/28/05 at 20-21).  Eventually, the case became "cold."

On October 26, 2001, state officials obtained a DNA sample from Ramos, who was incarcerated pursuant to a 1997 third-degree robbery conviction for which he was serving a term of imprisonment of 15 years to life.[6]  On July 2, 2002, A.V.'s rape kit was sent to a laboratory for DNA testing, in conjunction with a police "backlog project" to test more than 16,000 old rape kits being held in storage (305-10).  The examiner who performed the analysis testified that Ramos's DNA matched the DNA from the semen in A.V.'s rape kit (316).  Ramos was indicted for the crimes on May 29, 2003.  Reply Br. at 45.

B.  *Mistrial, Retrial, and Conviction*

---

[3]    Ramos's DNA matches the rape kits for both of the other rapes.  However, the district attorney never prosecuted those cases because one of the victims had since died of cancer, and the other victim was living outside the country (11/28/05 at 10-11).

[4]    The transcripts of the proceedings held on November 28, 2005, November 29, 2005, and December 1, 2005, are separately paginated and filed consecutively at ECF No. 12-2 at 111-19 and ECF No. 12-3 at 1-69.  I will refer to them by writing the hearing date and page number in parentheses.

[5]    The state's brief to the New York Court of Appeals provides as follows:  "[T]he victim viewed photographs from the PIMS system and/or viewed lineup identification at least five times between July 9, [1993], and April 5, 1994.  But this was . . . unsuccessful: the victim both identified a person other than defendant in a lineup on July 13, 1993, and failed to identify defendant in a photo array on April 5, 1994.  She again failed to identify defendant in a photo array on January 28, 2003."  D.A. Letter to N.Y. Ct. App. at 10.

[6]    A 1999 amendment to New York Executive Law § 995-c empowered the state to compel such DNA samples.  *See* N.Y. Exec. Law §§ 995-c, 997, *as amended by* 1999 New York Laws ch. 560, § 3 (eff. Dec. 1, 1999).

Ramos's first trial, scheduled to begin November 28, 2005, ended in a mistrial prior to the jury's being sworn because the trial prosecutor had fallen ill (12/1/05 at 2). Ramos was retried on January 3, 4, 5, 9, and 10, 2006. The jury convicted him on all counts.

1.    *Ramos's Election to Proceed* Pro Se *and Absent Himself in the First Trial*

Although Ramos had apparently already elected to proceed *pro se*, the trial judge, Justice Arthur J. Cooperman, conducted an additional colloquy with Ramos on November 28, 2005, to ascertain whether he wanted to continue to waive his right to counsel (11/28/05 at 2-8). The court asked, "[A]re you still asking to proceed in this case, in this trial without the benefit of an attorney?" Ramos responded, "[W]ith the exception of the argument for the DNA evidence," which he wanted his legal advisor, John Scarpa, to make. "I understand that," the court said, but "[o]therwise you wish to represent yourself?" "Yes, I do," Ramos answered (11/28/05 at 3). After being warned of the dangers and disadvantages of proceeding without an attorney, the court again asked, "But you still wish to proceed without the benefit of an attorney?" and Ramos answered, "Yes, sir" (11/28/05 at 8). The court then ruled that "under those circumstances we will continue to proceed" (11/28/05 at 8).

The court then conducted a *Sandoval* hearing to determine which of Ramos's prior crimes and bad acts would be admissible if he were to testify at trial. Ramos represented himself during this hearing. However, in responding to the government's recitation of his prior arrests and convictions, Ramos became upset, seemingly because he believed the police officers did not pursue the investigation into the rape of A.V. with proper diligence. He also contended that the DNA evidence in this case was taken from his bathroom by police officers who illegally entered his home in 1996 by impersonating parole officers (11/28/05 at 15-29).

When the court told him that these issues would not be explored by the court,

Ramos declared:

> I will not sit here and have this court convict me for wrongs done by the police. Whenever the DNA was taken out on this case, the statute of limitations had also expired on this and I will not be made a farce in my career. I will not have this be made a farce in my career. I do not wish to attend this trial. Whatever they wish to do in this case let them do it. I respectfully say I am sorry for acting in this way but there is no way I am going to come and be made a subject of this farce in my career.
> If this is clear, I would like to go back now.
> . . . .
> . . . I am a minority and I cannot afford a lawyer – it seems the system would like to take advantage but after being convicted here and serving 15 to life based on the fact that the court protected a police officer from having perjured himself, I am not going to go through it and I respectfully refuse to attend any further of my trial and conviction. Let it go on without me.
> . . . .
> I want to make it clear that I do not wish an attorney for me. What I feel is happening, there is corruption going on in the system, corruption going on. I have been convicted where the system helped a cop and erased the minutes from him having perjured himself. I have a decision where the statute of limitations is not opposed by the D.A. and a judge came in and became an advocate for the D.A. and denied my motions. Yes, I feel there is corruption and my question is who polices the courts?

(11/28/05 at 29-32). When the court asked Ramos, "Are you saying each and every one of these

convictions was tainted by corruption[?]" Ramos responded,

> No, sir[,] but there is corruption. My last 2 convictions yes, they had been doing what they wanted to. Why? Because I am a career criminal and they feel they can treat me like this or because I am in the minority. Yes, it is upsetting, Your Honor. Okay, right now Your Honor, yes, I feel a little sad. I do not wish to be present here no more.

(11/28/05 at 33). The court informed Ramos that he was waiving his right to be present and

participate in his trial, but that he would be kept "close enough" so that he would have the

opportunity to change his mind each day of trial (11/28/05 at 36).

5

The court then instructed John Scarpa, Ramos's appointed legal advisor, to act as Ramos's counsel in his absence, saying, "[W]e can't have an empty defense chair and table, so it's a good thing that you are advisory counsel because now you are back in the box . . . . So from this point on, you are the attorney for the defendant" (11/28/05 at 38).[7]  Scarpa then acted as Ramos's attorney during jury selection.  However, the trial prosecutor did not appear in court on the next two days because she was ill (12/1/05 at 6-7).  On the third day, the court ordered a mistrial because of the trial prosecutor's prolonged illness (12/1/05 at 1-3).  The court indicated that a new trial would commence January 3, 2006.

    2.    *The Court's Dismissal of Scarpa*

When the court indicated the new trial would commence January 3, 2006, Scarpa said that he would be unavailable on January 3rd, but could be available beginning January 4th, "unless you want to relieve me now" (12/1/05 at 3).  He went on, "I am not sure why I am this defendant's attorney at this point other than the fact that the court directed me to be his attorney but I would be happy to be relieved, let me put my voucher in and let this defendant represent himself as he's always asked to.  I can be shadow counsel again" (12/1/05 at 3).  The court responded:

> He is no longer representing himself because he took himself out
> of the case.  He may change his mind from now until the next time
> and maybe with a different advisor he may be more inclined to
> come back into the courtroom although he didn't say he wasn't
> happy with any attorney, as they are all corrupt as is the system
> according to him, but I think probably no useful purpose would be
> served by having you here as a disinclined attorney in terms of this
> particular case and since it really makes no difference who is here

---

[7]    Scarpa objected to the court's direction that he take over as counsel in Ramos's absence.  Scarpa stated, "I don't agree or subscribe to the decision made by the court.  This man has a constitutional right to go pro se and he's chosen to absent himself.  As his attorney appointed by this court, I want to preserve for the record his objection to having me as his attorney. . . .  He's actually said he would prefer inquest. . . .  I believe he has a constitutional right not to participate in the trial and not to put in a defense and I believe we are violating his constitutional rights at this time . . . if the court is directing me to be his lawyer" (11/28/05 at 39-40).

> as long as they are familiar with the case and somebody would
> have an opportunity to familiarize themselves with the
> case between now and January, I have no problem doing that, so we
> will relieve you from further activity.

(12/1/05 at 4).

Later, Ramos was produced in court and the judge informed him that he had declared a mistrial and relieved Scarpa. The court explained his dismissal of Scarpa by saying, "I felt that, number 1, you had no faith in him, in any event and he was assigned and you weren't here so that you weren't representing yourself, so as the legal advisor I allowed him to represent your interests but with this lapse in time I am in a position to appoint new counsel and I don't know how you feel about that person but it won't make a difference, as long as you are not here. If you were here, then of course you were pro se" (12/1/05 at 7).

Ramos did not object to the removal of Scarpa at that time.

3.  *Ramos's Refusal To Accept a New Legal Advisor and His Decision To Absent Himself From the Retrial*

At the beginning of the retrial on January 3, 2006, Ramos indicated that he still wanted to proceed *pro se*, but that he was unhappy with the new lawyer, Russell Rothberg, who had been appointed to advise him. Ramos requested "that Mr. Scarpa be put back on the case based on the fact that he is already familiar with the case" (3).[8] When the court explained that Mr. Scarpa had been replaced by Mr. Rothberg, the following exchange occurred:

| | |
|---|---|
| RAMOS: | Mr. Rothberg is not familiar with the case. |
| THE COURT: | . . . . <br> Mr. Rothberg . . . has been on the case for the past month . . . , and you, frankly, don't have a say in the matter. |
| RAMOS: | I don't have a say in the matter? |

---

[8]    The record reflects that Scarpa had been on Ramos's case for about a year and a half (11/28/05 at 42).

| | |
|---|---|
| THE COURT: | You heard me. |
| RAMOS: | I'm the one on trial. |
| THE COURT: | Yes, but you are not going to be here. Are you going to be here? |
| RAMOS: | Well, I want Mr. Scarpa representing me. I do not want him [Mr. Rothberg] to represent me. I had told the Court previously that I would like my lawyer to come see me at Rikers Island. I had told the Court to order the attorney to come see me to review the records. |
| | They expect me to go to trial without a lawyer having reviewed the records with me. I cannot say it would be a fair trial if I'm not familiar with certain parts of the records. . . . |
| | . . . Now you just want me to take anybody. I'm not taking him. |
| THE COURT: | Nobody is telling you to take anybody. You have no choice in who the legal advisor is. |

. . . .

| | |
|---|---|
| RAMOS: | . . . If you want a trial, hold it without me, but I will not participate in a trial where I have no assistance in this case. |
| THE COURT: | You are going to do the same thing you did last time. |
| RAMOS: | Mr. Scarpa was supposed to argue the DNA part of the case. He was familiar with the case. |

. . . .

| | |
|---|---|
| THE COURT: | . . . . |
| | . . . [In the last trial] Mr. Scarpa told me on each and every occasion that you refused to even speak to Mr. Scarpa, so your posture here is of no merit, simply stated. |
| RAMOS: | Then I do not wish to participate in the trial again if Scarpa can't participate. Let them convict me. I rather do that instead of you |

dictating the trial telling me what I can't do when I'm the defendant in this case.

. . . .

I do not wish for this lawyer, I don't even know his name.

. . . .

I do not wish him to represent me. I want Mr. Scarpa.

. . . .

THE COURT:     . . . .
          So you wish not to participate in the trial as you did before?

RAMOS:     Not with this attorney.
          Mr. Scarpa had an idea and eager to go ahead and present the idea, and I wish him to present his strategy how he wanted to defend the case.

THE COURT:     The fact of the matter is you wanted nothing to do with Mr. Scarpa when he was here.

RAMOS:     That is not true. Originally I had not wanted him to represent me. The court decided that he would act as my shadow counsel. I accepted him as shadow counsel.

. . . .

RAMOS:     Excuse me. I want to ask my present attorney how familiar is he with my case.

. . . .

          . . . [H]ow familiar is he?

THE COURT:     Sufficiently familiar and competent to the best of his ability.

RAMOS:     I would like to question him for the record, for the record to see if he is familiar with them.

THE COURT:     The Court does not necessarily need that.

RAMOS:     I thought so.

| THE COURT: | The Court makes the determination whether the attorney is capable.  I assure you that he is. |
| --- | --- |
| RAMOS: | I don't feel that he is familiar with the records. |
| THE COURT: | You may say what you wish, but you may now leave if that's your choice. |
| RAMOS: | I want to put the present attorney who I do not know his name representing me, and I wish Mr. Scarpa representing me.  If you wish for me to participate in this trial, then it will be with Mr. Scarpa. |
| THE COURT: | Well, you are not going to dictate that.  It's not your choice. |
| RAMOS: | Two and a half years it's been the courts dictating this case.  I have not been dictating nothing. |
| THE COURT: | All right.  The defendant is leaving the courtroom on his own. |

(4-13).

Rothberg then asked the court, "Judge, just so the record is absolutely clear, I know that the Court has made the inquiry of the defendant who has voluntarily absented himself from the courtroom, so again my status now changes from legal advisor to counsel for the defendant?" (13-14).  The court answered, "For the purposes of the trial, and for the jury's edification, obviously you have to be referred to as the defendant's attorney, yes, or you are representing the defendant" (14).  Rothberg again tried to clarify, "Well, would that be proper for me to say to the jury, that I am in fact his attorney and I am representing him?" (14).  The court answered, "Well, you are representing him, and you are an attorney.  Let's have the panel, please" (14), whereupon the jury panel was brought in.  After introductory remarks, the court introduced Rothberg to the jury panel as "the attorney for the defendant" (28).

However, after the lunch break, the prosecutor informed the court that according to his research, the court's current procedure of requiring Rothberg to act as Ramos's counsel violated Ramos's right to proceed *pro se*. The prosecutor stated, "What I can glean from the case law suggests to me that the defendant has a right to do both [go *pro se* and not be present] so long as he is not disrupting the process, and his mere request that he not be present is not in and of itself disruptive under the law . . . . You cannot force him to have Mr. Rothberg represent him merely because he was to go *pro se* and absent himself. . . . Similar to the *pro se* defendant who chooses to sit at the table and do absolutely nothing during the trial, he is simply choosing to do it from the other side of the wall" (74-77).

The court brought Ramos back out into the courtroom to clarify his intentions.[9] Ramos agreed he had expressed a desire both to proceed *pro se* without having Rothberg represent him and not to be present (83-84). The court admonished Ramos that "if we proceed in that fashion, there will be nobody here to represent your interests in terms of a body" (84). Ramos responded that he was "willing already to get convicted," and "take my chances with appeal because for me, I feel this is not justice what's going on here" (84). The court informed Ramos that he could always change his mind about going *pro se*, and that Rothberg would remain as a legal advisor in the courtroom in case he did change his mind.

Ramos responded that he did not wish to have Rothberg as his "advisor or nothing. If you wish to assign Mr. Scarpa to represent, I would be willing, but I do not want nobody else on my case" (86). The court said, "Well, you didn't want Mr. Scarpa, either," and Ramos answered, "I didn't want him to represent me. When the court assigned [him] as shadow

---

[9] Ramos resisted being produced. When the court asked for Ramos, the court officer indicated that "[t]he defendant does not want to come out" (82). The court then said, "We have to bring him out" (82). The sergeant asked, "Are you giving us a force order?," to which the court simply reiterated, "He has to come out" (82-83). The court clerk stated, "Let the record reflect the judge has authorized a force order" (83). Thereafter, Ramos entered the courtroom.

counsel . . . I said that I would be willing to proceed, and he would handle the DNA aspect of the case, and that's where we stood at" (87). The court told Ramos he did not have a right to such hybrid representation, saying "I rethought that . . . , and if you go pro se then you don't have the right to have counsel representing you while you are here in the courtroom" (87). Ramos said, "[Y]ou are putting me in a predicament where I'm not familiarized with the DNA paperwork, that's why Mr. Scarpa was going to represent that aspect of the case" (87). The court answered, "Well, that's the reason I suggested to you that it may not be a good idea to go pro se . . . [Y]ou can't be pro se and have an attorney as well" (87-88).

The court denied the prosecutor's request that the court clarify to the jury when it returned from lunch that Ramos was in fact representing himself in spite of his absence (89). Instead, the only clarification the court provided to the jury was that "Mr. Rothberg has been appointed by the Court to be available to serve as a legal advisor to Mr. Ramos" (90-91). Jury selection proceeded.

On the next day (January 4), prior to the jury's being brought in, Ramos, who was apparently in the pen area of the court, stated on the record, "I do not want to come into the courtroom" (145). The sergeant said, "He is not coming, Judge." The court responded, "He is going to have to. I'm not going in there. He has to come. . . . Mr. Ramos, I have to do this everyday" (146). With Ramos still apparently in the pens, the following exchange occurred:

RAMOS:        No, I already put on the record I do not wish to participate in no part of this trial. That should be good enough on record. You don't need to call me out here everyday.

THE COURT:    I have to.

RAMOS:        Your Honor, no, in the last trial, they weren't doing that they leave me in the bullpen, now all of a sudden you bring me out everyday.

12

(146).

On the following day (January 5), the court devised an "alternative method." The judge instructed the clerk to ask Ramos to come to court, and if he didn't want to, to read a prepared statement informing him of the status of the trial and reminding him of the rights he was giving up by being absent (168). The Court Clerk thereafter reported that the statement "was read to him, and he does not wish to come out" (170). When the court asked, "Did he say he does not wish to come out?," the clerk responded, "I asked him and he said no" (170). This "alternative method" was again followed the next trial day (January 9), and the Court Clerk reported that he had read the prepared statement to Ramos, and Ramos had said "he will only come out for sentence" (227). At the start of the next day (January 10), the Court Clerk again visited Ramos in the holding pen area, read him the judge's prepared statement, and "asked him again if he wanted to return to the courtroom at which point [Ramos] said no" (286).

On January 10, 2006, the jury returned a verdict of guilty on all counts after about an hour of deliberations (356, 360-61). Ramos declined to be present for the announcement of the verdict (358-59).

At sentencing, Ramos was adjudicated a persistent felony offender and given concurrent 25-year-to-life sentences on each count, to be served consecutively to the 15-year-to-life sentence he was already serving (PFO Trans. at 16, 30-31).[10]

C.      *Direct Appeal*

Ramos's appellate counsel, William Carney of The Legal Aid Society, raised two primary arguments on appeal to the Appellate Division: (1) Ramos was deprived of his Sixth Amendment rights (i) to counsel of his own choosing by the court's removal of Scarpa and (ii) to

---

[10]      The transcript of the combined persistent felony offender (PFO) hearing and sentencing, which took place on February 22, 2006, can be found at ECF No. 12-5 at 88.

*pro se* self-representation when Rothberg was introduced as Ramos's counsel to the jury; and (2) the court improperly delegated a judicial duty to a nonjudicial officer, violating Ramos's right to a jury trial under judicial supervision, by having the Court Clerk inform Ramos of the rights he was waiving by absenting himself instead of informing Ramos personally in open court each day (Carney Br. to App. Div.).  Ramos supplemented this brief with a *pro se* brief, in which he raised four additional arguments: (1) Ramos's privileges or immunities and due process rights were violated by the state's reviving a prosecution after the statute of limitations had expired; (2) Ramos was denied fair warning in violation of due process by the state court's retroactive application of *People v. Seda*, 93 N.Y.2d 307 (1999), to toll the statute of limitations in his case; (3) Ramos was denied due process and a fair trial when the trial court assumed the role of advocate in denying his unopposed motion for dismissal on statute of limitations grounds; (4) Ramos's sentencing as a persistent felony offender violated his due process and double jeopardy rights (Ramos *Pro Se* Br. to App. Div.).

The Second Department denied each of these claims.  It denied Ramos's Sixth Amendment self-representation and choice of counsel claims by saying, "Contrary to the defendant's contention, he was not denied that right [to self-representation] when the court appointed a new attorney to act as standby counsel."  *People v. Ramos*, 61 A.D.3d 783, 783 (2d Dep't 2009).  The court denied the other basis for appeal raised by Ramos's counsel by saying, "[U]nder the circumstances of this case, where the defendant waived his right to be present at trial and refused to leave the court confinement pens, the court did not delegate an essential judicial function to a court clerk when, at the court's direction, the clerk explained to the defendant his right to be present and informed him that the trial would continue in his absence."  *Id.* at 783-84.  The court also rejected each of the grounds for appeal raised in Ramos's *pro se*

brief. It denied the first ground on the merits by concluding that "[t]he prosecution was not barred by the five-year statute of limitations" because "the defendant's whereabouts were continuously unknown and continuously unascertainable by the exercise of reasonable diligence until his DNA profile from a sexual assault kit was matched to DNA evidence taken from him pursuant to a subsequent incarceration." *Id.* at 783. The court then rejected his second and fourth grounds as both procedurally barred and without merit, saying, "The defendant's contentions regarding an ex post facto prosecution and a violation of due process during sentencing are unpreserved for appellate review and, in any event, are without merit." *Id.* at 784. Finally, the court rejected Ramos's third ground as procedurally barred, stating that "[t]he defendant's contention . . . that the court improperly assumed the role of advocate[] involves matter dehors the record and may not be reviewed on direct appeal." *Id.*

Ramos petitioned the New York Court of Appeals for leave to appeal, which was granted, *People v. Ramos*, 13 N.Y.3d 748 (2009), although the court only granted "alternative review" pursuant to Rule 500.11, which does not allow for full briefing or oral argument.[11] On October 5, 2009, Ramos's counsel submitted a letter brief to the Court of Appeals in accordance with Rule 500.11, in which he argued primarily that Ramos's prosecution violated the statute of limitations. (*See* Carney Letter to N.Y. Ct. App. at 8-12.) He also stated that he incorporated all the other arguments raised before the Appellate Division. (*Id.* at 12.) Ramos then wrote a supplemental *pro se* letter brief to the Court of Appeals on November 9, 2009. (*See* Ramos *Pro Se* Letter to N.Y. Ct. App.) His letter argued that the Court should vacate his conviction because (1) the retroactive application of *People v. Seda*, 93 N.Y.2d 307 (1999), to toll the statute of

---

[11]     The "alternative review" procedure, provided for by Rule 500.11 of the New York Court of Appeals Rules of Practice, was previously called "Sua Sponte Merits" examination or SSM. *See* N.Y. Ct. Rules § 500.11; N.Y. Court of Appeals, IV. RULE 500.11 REVIEW -- ALTERNATIVE PROCEDURE FOR SELECTED APPEALS, http://www.courts.state.ny.us/CTAPPS/forms/civil4_05.htm (last visited December 19, 2011).

limitations in his case violated his right to fair notice under the Due Process Clause; (2) his prosecution was wrongfully based on DNA obtained from a person other than the victim in this case; (3) the lower court improperly acted as an advocate for the government; and (4) he was improperly sentenced as a persistent felony offender.

On December 15, 2009, the Court of Appeals denied all of Ramos's claims and affirmed the Appellate Division's order. *People v. Ramos*, 13 N.Y.3d 881 (2009). The court held that "[t]he prosecution was not barred by the five-year statute of limitations pursuant to [C.P.L. §] 30.10(2)(b)," because the "defendant's whereabouts were 'continuously unknown and continuously unascertainable,' despite the reasonable diligence of the detectives assigned to the case, until his DNA profile from the rape kit taken from the victim was matched to DNA evidence taken from defendant pursuant to a subsequent incarceration." *Id.* at 881-82. The court then ruled that the "[d]efendant's contentions that the extension of the statute of limitation in this case constituted an ex post facto law and that his sentencing as a persistent felony offender violated his right to due process of law are not preserved for review." *Id.* at 882. Finally, the court held that "Defendant's remaining arguments lack merit." *Id.*

Ramos petitioned the court for reargument and reconsideration on January 7, 2010, which the court summarily denied. *People v. Ramos*, 14 N.Y.3d 794 (2010).

D.    *Collateral Challenge in State Court*

Ramos stated at oral argument that he has filed a collateral proceeding under N.Y.C.P.L. § 440 challenging his conviction.[12] This court has not been provided with a copy of this § 440 motion by either Ramos or the government.

E.    *The Present Petition*

---

[12]    Ramos indicated at oral argument that the grounds of his § 440 motion include the statute of limitations claim; an alleged *Brady* violation; some *ex parte* proceedings in state court regarding a 1996 search of his home that he never knew about until recently; and a claim of fraud on the court.

Ramos filed the present petition for a writ of habeas corpus on March 10, 2011. He raises what he characterizes as six claims for relief: (1) he was deprived of his Sixth Amendment right to counsel of his choosing when the court dismissed Scarpa and of his Sixth Amendment right to self-representation when the court introduced Rothberg to the jury as his lawyer; (2) the court improperly delegated a judicial duty to a nonjudicial officer in violation of his right to a jury trial under judicial supervision; (3) his prosecution was barred by the statute of limitations; (4) the application of the statute of limitation's tolling provision to his case violated his due process right to fair warning; (5) the court improperly assumed the role of advocate rather than an impartial referee in violation of his due process and fair trial rights when the court denied his unopposed motion to dismiss the indictment on statute of limitations grounds; (6) his sentencing as a persistent felony offender did not adhere to mandated procedures and violated his due process and double jeopardy rights.

The District Attorney of Queens County filed an opposition to Ramos's petition on September 2, 2011. Ramos filed a rely on November 29, 2011. Oral argument was held on December 22, 2011, at which Ramos appeared by videoconference.

## DISCUSSION

A.      *The Timeliness of the Petition*

As part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress enacted a one-year statute of limitations for federal habeas corpus petitions brought by state prisoners. *See* 28 U.S.C. § 2244(d)(1). For purposes of this petition, the limitations period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). A judgment becomes final for purposes of § 2244(d)(1)(A) when the Supreme Court denies

certiorari or when the time for seeking such review has expired. *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001).

In this case, Ramos did not petition the Supreme Court for certiorari review. Accordingly, Ramos's conviction became final after the expiration of the period in which he could have sought such review. *See Fernandez v. Artuz*, 402 F.3d 111, 112 (2d Cir. 2005). The Supreme Court rules state that "a petition for a writ of certiorari to review a judgment in any case . . . entered by a state court of last resort . . . is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment." Sup. Ct. R. 13(1). However, "if a petition for rehearing is timely filed in the lower court by any party, . . . the time to file the petition for a writ of certiorari for all parties . . . runs from the date of the denial of rehearing." Sup. Ct. R. 13(3). Ramos petitioned for rehearing by New York's state court of last resort, the New York Court of Appeals, which denied his petition on March 30, 2010. *People v. Ramos*, 14 N.Y.3d 794 (2010). Accordingly, Ramos's conviction became final 90 days after March 30, 2010, or on June 28, 2010. AEDPA's one-year limitations period began to run on that date, giving Ramos until June 28, 2011, to file his habeas petition in federal court. Because his petition was filed on March 10, 2011, it was timely.

B.      *Ramos's Claims for Relief*

1.      *The Statute of Limitations Bar*

a.      *Violation of the New York Statute of Limitations*

Ramos contends that his prosecution was barred by the state statute of limitations. Pet. at 18. The indictment in this case was filed in May 2003 – almost ten years after Ramos's crime on July 8, 1993.

The statute of limitations that applied to New York state prosecutions in May 2003 provided that a prosecution for any felony other than a class A felony "must be commenced within five years after the commission thereof." N.Y.C.P.L. § 30.10(2)(b) (2003).[13] Rape in the first degree and sodomy in the first degree are class B felonies. *See* N.Y. Penal Law §§ 130.35, 130.50. Robbery in the second degree is a class C felony. *Id.* § 160.10. Accordingly, a five-year limitations period applied to Ramos's crime, and, unless the period was properly tolled, Ramos's prosecution nearly 10 years after the crime was time-barred.

This general limitations period is subject to a tolling exception, however, which provides:

> In calculating the time limitation applicable to commencement of a criminal action, the following periods shall not be included:
>
>> (a) Any period following the commission of the offense during which . . . the whereabouts of the defendant were continuously unknown and continuously unascertainable by the exercise of reasonable diligence. However, in no event shall the period of limitation be extended by more than five years beyond the period otherwise applicable under subdivision two.

N.Y.C.P.L. § 30.10(4)(a)(ii).

The New York Court of Appeals held that Ramos's prosecution "was not barred by the five-year statute of limitations pursuant to [C.P.L. §] 30.10(2)(b)," because, "[a]lthough the indictment was nearly 10 years after the incident, defendant's whereabouts were 'continuously unknown and continuously unascertainable,' despite the reasonable diligence of the detectives assigned to the case, until his DNA profile from the rape kit taken from the victim

---

[13] As of May 2003, only class A felonies were exempted from N.Y.C.P.L. § 30.10(2)(b)'s five-year limitations period. *See* N.Y.C.P.L. § 30.10(2)(a) (2003) ("A prosecution for a class A felony may be commenced at any time."). On June 23, 2006, the New York legislature revised the statute to allow prosecutions for first-degree rape, a class B felony, also to "be commenced at any time." *See* 2006 N.Y. Laws ch. 3, § 1 (codified at N.Y.C.P.L. § 30.10(2)(a)); *see also id.* § 5 ("This act shall take effect immediately and . . . sections one and two of this act shall apply to offenses committed on and after such date as well as to offenses committed prior thereto . . . .").

was matched to DNA evidence taken from defendant pursuant to a subsequent incarceration."[14] *Ramos*, 13 N.Y.3d at 881-82 (quoting N.Y.C.P.L. § 30.10(4)(a)(ii)).

In reaching this conclusion, the *Ramos* court cited to *People v. Seda*, 93 N.Y.2d 307, 311 (1999), in which the court had construed the word "whereabouts," as used in N.Y.C.P.L. § 30.10(4)(a)(ii), to include the defendant's "identity." Thus, the statutory period is tolled when police "have identified the perpetrator but lack knowledge of his or her physical location, *or* where they have not identified the perpetrator at all and thus cannot determine where he or she is." *Seda*, 93 N.Y.2d at 311 (emphasis added).

The *Ramos* court also cited to *People v. Brown*, 13 N.Y.3d 332 (2009), in which the court denied an ineffective assistance of counsel claim predicated on a failure to move to dismiss the indictment on statute of limitations grounds, when, under circumstances similar to this case, the state initiated a prosecution for sodomy and kidnapping nearly 10 years after the crime when a backlog DNA analysis project led to a "cold hit" for the defendant. The *Brown* court relied on its determination that the "defendant's motion would have been meritless," to conclude that his counsel was therefore not ineffective in failing to make this motion, *id.* at 420-21, and affirmed the Appellate Division's order, which had held that, "[a]lthough the indictment was filed in July 2003, nearly 10 years after the incident, the defendant's whereabouts were continuously unknown and continuously unascertainable by the exercise of reasonable diligence until the defendant's DNA profile from the sexual assault evidence kit was matched to DNA evidence taken from the defendant pursuant to a subsequent incarceration." *People v. Brown*, 50 A.D.3d 1154, 1155 (2d Dep't 2008).

---

[14] The state argued in its submission to the New York Court of Appeals that DNA testing was not routinely employed in rape and sexual assault cases until at least 1999. *See* D.A. Letter to N.Y. Ct. App. at 13. Beginning in 1999, New York City attempted to test a backlog of approximately 16,000 rape kits awaiting forensic examination. *Id.* at 13-14. It was only in 2000, when the mayor allocated $12 million to pay private laboratories to analyze the evidence, that the City's rape kit backlog was largely cleared. *Id.* at 14 n.12.

Ramos asserts that the statutory tolling provision should not have applied to his case. However, this is not a federal issue. The Supreme Court has made it clear that "federal habeas corpus relief does not lie for errors of state law. . . . [I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (internal quotations and citations omitted). "[A] state court's failure properly to apply a state statute of limitations does not violate due process or, indeed, any other provision of the Constitution or a federal statute," and thus does not provide a basis for granting a writ of habeas corpus. *Loeblein v. Dormire*, 229 F.3d 724, 726 (8th Cir. 2000); *accord Humphrey v. Cain*, 120 F.3d 526, 534 (5th Cir. 1997) ("[T]he misapplication of Louisiana law [with respect to its statute of limitations] does not rise to the level of a deprivation of constitutional right."), *rev'd on rehearing on other grounds*, 138 F.3d 552 (5th Cir. 1997) (en banc), *cert. denied*, 525 U.S. 935 (1998); *Wilson v. Mitchell*, 250 F.3d 388, 396-97 (6th Cir. 2001) (rejecting petitioner's statute-of-limitations claim for 22-year delay in prosecution because "claims that a state erred in interpreting or applying its own criminal law or procedural rules are almost always rejected as grounds for granting the writ of habeas corpus" except in the rare case where "the magnitude of the legal error and the innocence of the accused [are] manifest" (quoting *Olsen v. McFaul*, 843 F.2d 918, 933 (6th Cir. 1988))). Therefore, as federal courts have universally found, "[p]etitioner's claim that the applicable state statute of limitations had run when he was charged with these crimes is . . . non-cognizable in a federal habeas corpus proceeding, because it raises solely an issue of state law." *Burns v. Lafler*, 328 F. Supp. 2d 711, 719 (E.D. Mich. 2004); *accord Velazquez v. Sternes*, 151 F. Supp. 2d 946, 950 (N.D. Ill. 2001); *Couch v. Warden*, No.

1:10-cv-22, 2011 WL 1043471, at *4-*5 (S.D. Ohio Feb. 24, 2011), *report and recommendation adopted*, 2011 WL 1002187 (S.D. Ohio Mar. 17, 2011); *Alsabur v. Bobby*, No. 1:05cv1626, 2005 WL 1983367, at *2 (N.D. Ohio Aug. 17, 2005) (rejecting statute-of-limitations claim on habeas because the issue is "not of a federal constitutional nature," and "[i]t is not the province of this court to reexamine state-court determinations on state-law questions").

Ramos attempts to distinguish this precedent by saying that he is not claiming that "the state court misapplied the state statute of limitations," but rather that the state "retroactively reviv[ed] a previously barred prosecution in violation of the Due Process Clause." Reply Br. at 44. He writes, "[a]lthough the charges in petitioner's case had expired under the statute of limitations, New York took an unconstitutional course in reviving a previously barred prosecution by applying a Court of Appeals decision (*People v. Seda*) that was decided after the statute of limitations had expired." Reply Br. at 45 (italics added). But this is simply an attempt by Ramos to repackage his state claim in federal garb. It does not alter the fundamental point that this issue deals only with a state interpretation of state law. "[A]lleged errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." *DiGuglielmo v. Smith*, 366 F.3d 130, 136 (2d Cir. 2004) (internal quotation marks omitted). "[N]ot every error of state law can be transmogrified by artful argumentation into a constitutional violation." *Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002) (internal quotation marks omitted). State courts remain "the ultimate expositors of state law." *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).

Accordingly, no habeas relief is warranted based on Ramos's claim that his prosecution commenced after the state statute of limitations applicable to his crime had run.

b. *Due Process Violation from Pre-indictment Delay*

Before Ramos's complaint about the nearly 10-year delay in his prosecution can rise to a federal constitutional claim, he must argue that the delay violated his due process rights. Due process violations are not coextensive with violations of statutory limitations periods: "[S]tatutes of limitations . . . provide the primary guarantee[] against bringing overly stale criminal charges . . . [;] the Due Process Clause has a limited role to play in protecting against oppressive delay." *United States v. Lovasco*, 431 U.S. 783, 789 (1977) (internal quotation marks and citations omitted). Pre-indictment delay can present a cognizable due process claim, but only where the defendant suffers actual prejudice to his right to a fair trial from the delay, *and* the government undertook the delay "to gain tactical advantage over the accused." *See Lovasco*, 431 U.S. at 789-90, 795-96 (internal quotation marks omitted).[15]

Even if Ramos's statute of limitations claim were construed as a due process pre-indictment delay claim, it would still fail. First, Ramos has failed to offer any evidence that the delay in charging him was an intentional device by the prosecution to gain a tactical advantage over him. In fact, the opposite appears to be true – the government simply did not have a prosecutable case until the DNA hit occurred in 2002. As the Supreme Court has recognized, "the interests of the suspect and society are better served if, absent bad faith or extreme prejudice to the defendant, the prosecutor is allowed sufficient time to weigh and sift evidence to ensure an indictment is well-founded." *United States v. Eight Thousand Eight Hundred Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 563 (1983). Moreover, Ramos has failed to demonstrate that he suffered any prejudice as a result of the delay. He does not point to any

---

[15] *See also United States v. Alameh*, 341 F.3d 167, 176 (2d Cir. 2003) (rejecting a due process pre-indictment delay claim because there was no evidence of intentional delay); *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999) ("A defendant bears the heavy burden of proving both that he suffered actual prejudice because of the alleged pre-indictment delay and that such delay was a course intentionally pursued by the government for an improper purpose." (internal quotation marks omitted)); *United States v. Scarpa*, 913 F.2d 993, 1014 (2d Cir. 1990); *United States v. Hoo*, 825 F.2d 667, 671 (2d Cir. 1987); *United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979) ("[P]re-indictment delay transgresses due process limits only when there is a showing of actual prejudice to the defendant's right to a fair trial [a]nd unjustifiable Government conduct.").

witnesses or physical evidence that was unavailable at trial as a result of the delay. Accordingly, Ramos's due process rights were not violated by the pre-indictment delay in this case.

        c.     *Due Process Violation Because Ramos Did Not Receive "Fair Warning" that His Statutory Limitations Period Was Subject to Tolling*

Ramos also presses a due process claim based on his asserted lack of "fair warning that DNA or identity would be a construction on extending the statute of limitations." Pet. at 18. In his reply brief, he elaborates that "[i]t is petitioner's contention that his conviction violates the fair-warning requirement of the Due Process Clause because it was based on a New York Supreme Court decision, *People v. Seda*, 93 N.Y.2d 307 (1999), that was decided after the statute of limitations had expired in this case." Reply Br. at 60.

This claim is procedurally barred. Under "principles of comity and federalism," *Whitley v. Ercole*, 642 F.3d 278, 285 (2d Cir. 2011) (internal quotation marks omitted), federal habeas review is generally prohibited where a state court denies relief based on an "adequate and independent state ground" – such as a state procedural bar. *Harris v. Reed*, 489 U.S. 255, 261-62 (1989). Thus, "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent state law ground doctrine "curtails reconsideration of the federal issue on federal habeas." *Id.* at 264 n.10; *but see Lee v. Kemna*, 534 U.S. 362 (2002) (recognizing that "[t]here are . . . exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question."). To overcome a procedural bar, "the habeas petitioner [must] show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris*, 489 U.S. at 262; *accord Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The New York Court of Appeals expressly denied Ramos's fair-notice claim on the ground that it was procedurally barred. *See Ramos*, 13 N.Y.3d at 882 ("Defendant's contention[] that the extension of the statute of limitation in this case constituted an ex post facto law . . . [is] not preserved for review.").[16] Because this procedural bar constitutes an independent and adequate state law ground for decision, Ramos may not raise this claim on federal habeas unless he can show cause for and prejudice from his default, or a fundamental miscarriage of justice.

Ramos purports to demonstrate cause for his default by saying "the petitioner proceeded pro se, and during the process of prosecution the petitioner was being transferred from New York City Jail to Upstate prison on a regular basis. This made research impossible because when he did made [sic] the law library it was time to go back down to court or go back upstate. . . . [P]etitioner's legal work was packed in draft bags and the draft bags would not follow him or could not be found. . . . He was therefore unable to thoroughly research the specific law on point." Reply Br. at 66. However, courts in this circuit have held that "[a]n inmate's pro se status is not sufficient to establish cause." *Jordan v. Bennett*, 968 F. Supp. 118, 121 (W.D.N.Y. 1997) (citing *Udzinski v. Kelly*, 734 F. Supp. 76, 83 (E.D.N.Y. 1990)). Nor does ignorance suffice to establish cause. *Cappiello v. Hoke*, 698 F. Supp. 1042, 1052 (E.D.N.Y. 1988). In any

---

[16] Ramos correctly points out that his argument falls under the Due Process Clause rather than the Ex Post Facto Clause of the Constitution. *See* Pet. at 18. As the Supreme Court has explained, while "the Due Process and Ex Post Facto Clauses safeguard common interests – in particular, the interests in fundamental fairness (through notice and fair warning) and the prevention of the arbitrary and vindictive use of the laws[ – ] . . . [t]he Ex Post Facto Clause, by its own terms, does not apply to courts." *Rogers v. Tennessee*, 532 U.S. 451, 460 (2001). Rather, the Court explained that "retroactive judicial decisionmaking" is checked not by "the specific prohibitions of the Ex Post Facto Clause," but by "the more basic and general principle of fair warning." *Id.* at 458-59. Because the New York Court of Appeals was undoubtedly aware that the Ex Post Facto Clause does not apply of its own force to judicial decisionmaking, I have no trouble concluding that the state court was ruling on Ramos's due process argument when it found unpreserved "[d]efendant's contention[] that the extension of the statute of limitation in this case constituted an ex post facto law." *Ramos*, 13 N.Y.3d at 882.

event, Ramos cannot show prejudice, because his claim fails on the merits. *See Udzinski*, 734 F. Supp. at 83-84.

The Supreme Court has long recognized the "basic principle that a criminal statute must give fair warning of the conduct that it makes a crime." *Rogers*, 532 U.S. at 458 (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 350 (1964)). As explained by Justice Holmes, "[a]lthough it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle v. United States*, 283 U.S. 25, 27 (1931); *see also* John Calvin Jeffries, Jr., *Legality, Vagueness, and the Construction of Penal Statutes*, 71 Va. L. Rev. 189, 211-12 (1985) (explaining notice requirement as the "unacceptability . . . of imposing criminal liability where the prototypically law-abiding individual in the actor's situation would have had no reason to act otherwise"). "Deprivation of the right to fair warning . . . can result both from vague statutory language and from an unforeseeable and retroactive judicial expansion of statutory language that appears narrow and precise on its face." *Rogers*, 532 U.S. at 458 (citing *Bouie*, 378 U.S. at 352). The Court has therefore held that "if a judicial construction of a criminal statute is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue, the construction must not be given retroactive effect." *Id.* (internal quotation marks and alterations omitted); *see also United States v. Lanier*, 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."). However, due process does not prohibit the inevitable process "of judicial evolution" by which courts "fashion[] and refin[e] the law . . . in light of reason and experience." *Rogers*, 532 U.S. at 462.

Ramos argues he was deprived of fair notice because his five-year limitations period expired in 1998 – *before* the New York Court of Appeals interpreted N.Y.C.P.L. § 30.10(4)(a)(ii)'s tolling provision in *People v. Seda*, 93 N.Y.2d 307, 311 (1999), to reach situations in which the defendant's *identity* is continuously unknown and continuously unascertainable by the exercise of reasonable diligence.[17]

The New York Court of Appeals' retroactive application of *Seda* and *Brown* to Ramos's case did not violate due process. The court's construction of the tolling provision in *Seda* to reach defendants whose identities are unknown was not an "unexpected and indefensible" judicial construction of the statute. *See Rogers*, 532 U.S. at 458. Even less "unexpected" was the court's subsequent extension of *Seda* in *Brown* to toll the statutory period during which the defendant could not be identified as the perpetrator until a DNA match was discovered many years later. *See Brown*, 13 N.Y.3d at 341.

The tolling statute at issue here was enacted in its current form in 1970, long before Ramos's crime or the alleged expiration of his limitations period. *See* 1970 New York Laws, ch. 996, § 1. In *Seda*, and later in *Brown*, the New York Court of Appeals used traditional principles of statutory interpretation to interpret an ambiguous term in light of plain meaning, statutory purpose, and legislative history. The *Seda* court called its construction of the statute "straightforward," and noted that it better comported with "the statute's purposes and legislative history." *Seda*, 93 N.Y.2d at 311. It further determined that, especially in light of the legislature's revision of the statute in 1970, "[t]he focus of the tolling exception rests on the

---

[17]    I note, however, that the *Appellate Division*'s decision in *Seda*, which reached the same conclusion and which the New York Court of Appeals affirmed, was rendered on January 26, 1998, and thus could have provided Ramos with warning of this potential construction of the statute prior to the expiration of Ramos's statute of limitations – without any tolling. *See People v. Seda*, 246 A.D.2d 675 (2d Dep't 1998). And of course, Ramos is not the only one who would have escaped prosecution if *Seda* had been decided differently. Seda himself would have been spared prosecution if he had persuaded the court to accept his construction of the statute. But, notably, Seda did not raise, and the court did not address, any potential due process problems stemming from the court's application of its interpretation of the statute to Seda in that case.

difficulty of finding the defendant whether or not the police are aware of his or her identity." *Id.* at 312.

"A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 312-13 (1994). Thus, "when [a] court construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law." *Id.* at 313 n.12. The construction is therefore binding retrospectively so long it was not "so unforeseeable that [the petitioner] had no fair warning that it might come out the way it did." *Davis v. Moore*, 772 A.2d 204, 217 (D.C. Ct. App. 2001). "This is a stringent test; for courts frequently and inevitably issue legal rulings that are more or less unanticipated – particularly to those on the losing side – but that are routinely and properly applied to the parties in whose cases the rulings come." *Id.* at 217-18; *see also Johnson v. United States*, 529 U.S. 694, 698 n.2, 706 (2000) (applying construction of statute retroactively despite acknowledging that construction was linguistically "unconventional" and contrary to the interpretations of nine courts of appeals).[18]

---

[18]     *See also Perez v. Fisher*, No. 02 Civ. 3443(MBM), 2006 WL 510513, at *7-*9 (S.D.N.Y. Mar. 1, 2006) (holding that New York court's construction of criminal statute could be applied retroactively without violating due process because, "[t]aking into account" the statute's text and purpose, the court's reading of the statute was not "so fundamentally unfair" that the statute gave the petitioner "no reasonable notice that his behavior fell within it"); *Washington v. Comm'r of Corr.*, 950 A.2d 1220, 1232-33 & n.9 (Conn. 2008) (holding judicial construction of statute could apply retroactively without violating due process where the decision did not "overrule a prior decision" but, rather, construed the meaning of a statute using "well established principles of statutory construction"); *State v. Miranda*, 794 A.2d 506, 515 (Conn. 2002) (holding that fair notice component of due process was not violated by retroactive application of judicial construction of criminal statute because construction had been reached by "employ[ing] the ordinary tools of statutory construction"). *See generally Rivers*, 511 U.S. at 312 ("The essence of judicial decisionmaking – applying general rules to particular situations – necessarily involves some peril to individual expectations because it is often difficult to predict the precise application of a general rule until it has been distilled in the crucible of litigation."); *United States v. Sec. Indus. Bank*, 459 U.S. 70, 79 (1982) ("The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student."); *Ortiz v. New York State Parole*, 586 F.3d 149, 159 (2d Cir. 2009) ("[T]he unavoidable ambiguities of language do not transform every circumstance in which judicial construction is necessary into a violation of the fair notice requirement.").

Ramos's claim also fails on a more fundamental level. The fair-warning principle is concerned with providing notice of the illegality and associated punishment of contemplated *conduct*. "The underlying principle [of the fair warning requirement] is that no man shall be held criminally responsible for *conduct* which he could not reasonably understand to be proscribed." *Bouie*, 378 U.S. at 351 (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954) (emphasis added)); *see also Lanier*, 520 U.S. at 266-67 ("[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's *conduct* was criminal." (emphasis added)); *Rose v. Locke*, 423 U.S. 48, 50 (1975) ("All the Due Process Clause requires is that the law give sufficient warning that men may *conduct* themselves so as to avoid that which is forbidden." (emphasis added)); *accord Rubin v. Garvin*, 544 F.3d 461, 469 (2d Cir. 2008). Unlike a substantive criminal prohibition – the boundaries of which can potentially guide conduct – it is hard to conceive of how the rules of tolling of the statutory limitations period applicable to Ramos's crime had the potential to shape Ramos's conduct such that there was anything he needed to be "fairly warned" about. *Cf. Rubin*, 544 F.3d at 469 (holding that petitioner's "vagueness claim fails the test of common sense" because the contested regulation was "not a criminal statute that required [the petitioner] to adhere to a specific standard of conduct," but only a factor the jury considered in determining the wrongfulness of petitioner's conduct). Ramos had a constitutionally protected interest in not being subjected to a penal sanction based on behavior the legislature had not previously made illegal. He had no such interest in being subject to such a sanction for only five years after breaking the law.

Because Ramos's fair-warning claim fails on the merits, he cannot show prejudice from his procedural default in state court, and thus he is procedurally barred from raising this claim in a federal habeas petition as well.

2.      *Judicial Assumption of Role of Advocate*

Ramos asserts in his petition that he "was denied due process of law and a fair trial when the . . . judge assumed the role of advocate rather than an impartial referee." Pet. at 18 (capitalization omitted). Ramos explains the factual basis of this claim by saying that his original statute of limitations dismissal motion was unopposed, and therefore by denying the unopposed motion, the court "assumed the role of advocate" and "argu[ed] for the People." Pet. at 19.

Respondent argues that this claim is unexhausted. A state prisoner seeking federal habeas review of his conviction must first exhaust available state remedies. 18 U.S.C. § 2254(b)(1). To exhaust state remedies, the petitioner must "fairly present" his federal claim to the highest state court with jurisdiction over it in order to give the state the "opportunity to pass upon and correct alleged violations of its prisoner's federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation marks and alterations omitted). The petitioner must have informed the state court of both the factual and legal basis for the federal claim. *Picard v. Connor*, 404 U.S. 270 (1971); *Daye v. Attorney Gen. of New York*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc). Where a petitioner "used the wrong procedural vehicle" to present his claim to the state courts, "the state courts never had a fair opportunity to pass on his claim" and the claim is unexhausted. *Dean v. Smith*, 753 F.2d 239, 241 (2d Cir. 1985).

The state intermediate appellate court specifically refused to consider on direct appeal Ramos's claim that the "court improperly assumed the role of an advocate" because it "involves matter dehors the record." *Ramos*, 61 A.D.3d at 784. This suggests that Ramos "used the wrong procedural vehicle" to present his claim, and instead needed to pursue the claim

collaterally, such as through a N.Y.C.P.L. § 440.10 motion, in order to exhaust it.[19]  However,

the New York Court of Appeals rejected this claim on the merits by ruling (after disposing of

Ramos's statute of limitations, fair warning, and persistent felony offender sentencing claims)

that "Defendant's remaining arguments lack merit." *Ramos*, 13 N.Y.3d at 882.[20]  Accordingly, I

will treat Ramos's claim as exhausted and denied on the merits by the state courts.

When a petitioner's claim for habeas relief was previously decided on the merits

by a state court, a federal court may grant habeas relief only if the state court's decision "was

contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States," or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."  28

U.S.C. § 2254(d)(1)-(2).[21]  In addition, a federal habeas court must presume all state court factual

determinations to be correct, unless the petitioner rebuts the findings by clear and convincing

evidence.  *Id.* § 2254(e)(1).

The Supreme Court has interpreted the phrase "clearly established Federal law" to

mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of

the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also*

---

[19]     Respondent also contends that Ramos did not exhaust this claim because he never alerted the state courts to its federal nature.  However, Ramos does in fact call the claim a "due process" claim in his briefs to the Appellate Division, and cites caselaw framing the issue as one of due process.  *See, e.g.*, Ramos's *Pro Se* Br. to App. Div. at 69 (quoting, *inter alia*, *People v. Cruz*, 100 A.D.2d 518 (2d Dep't 1984) for the proposition that "[w]hen . . . the Trial Judge . . . assumes a prosecutorial role, there is a denial of due process").

[20]     I conclude that this fair trial claim was among those that the court concluded "lack[ed] merit," because Ramos's counsel's submission to the New York Court of Appeals argued only the statute of limitations issue, and then referred the court to "the other five issues raised in appellant's briefs below," including Ramos's *pro se* supplemental brief to the Appellate Division which raised this fair trial claim.  *See* Carney Letter to N.Y. Ct. App. at 12.  Ramos himself then submitted a supplemental letter to the New York Court of Appeals *pro se*, dated November 9, 2009, which also raised this fair trial claim.  *See* Ramos *Pro se* Letter to N.Y. Ct. App. at 18.  Because the Court of Appeals addressed more than just Ramos's statute of limitations claim in its order, I conclude that it therefore considered all of Ramos's claims raised before the Appellate Division and/or in his *pro se* supplemental letter to the Court of Appeals.

[21]     This limitation on relief is frequently referred to as "AEDPA deference."  *E.g.*, *Cullen v. Pinholster*, 131 S. Ct. 1388, 1410 (2011); *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2265 (2010); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).

*Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* Elaborating on the "unreasonable application" standard, the Supreme Court has held that a habeas court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786. AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether it gives reasons for its determination or refers to federal law in its decision. *See Richter*, 131 S. Ct. at 785; *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

Ramos's counsel filed an omnibus motion in state court on July 21, 2003, asking the court, *inter alia*, to dismiss the indictment for lack of timely prosecution under N.Y.C.P.L. § 30.10(2)(b). On August 5, 2003, Ramos submitted a *pro se* motion to dismiss the indictment, similarly for lack of timely prosecution. On August 21, 2003, the government responded to the omnibus motion and generally opposed dismissal of the indictment, but did not specifically oppose dismissal on timeliness grounds. The government's response attached exhibits evidencing the 2002 DNA match, the victim's inability to identify Ramos in a photo array in 1994, and Ramos's refusal in January 2003 to consent to be swabbed for DNA. *See* D.A. Letter

to N.Y. Ct. App. at 3.  The government did not file a separate opposition to Ramos's *pro se* motion.  On September 2, 2003, the trial court denied the motions to dismiss the indictment on the basis of the evidence the government attached to its opposition, concluding that the statute of limitations was tolled pursuant to N.Y.C.P.L. § 30.10(4)(a)(ii) for an additional five years during the time that the defendant's whereabouts were unknown – that is, until the defendant's identity was established by the DNA match.  N.Y.C.P.L. § 210.45(5)(c) permits the court to deny a motion to dismiss an indictment without conducting a hearing if "[a]n allegation of fact essential to support the motion is conclusively refuted by unquestionable documentary proof."  The court in this case determined that Ramos's motion was refuted by the state's documentary evidence demonstrating that his identity was continuously unknown and unascertainable through reasonable diligence until DNA testing revealed his identity in 2002.

In doing so, the state court did not inappropriately assume the role of advocate, and the New York Court of Appeals' denial of this claim was not contrary to or an unreasonable application of clearly established Supreme Court law.  A defendant has a right to a fair trial, which means that the "judge should not become an advocate and argue the case for either side"; rather, a trial court "should exercise self-restraint and preserve an atmosphere of impartiality and detachment."  *United States v. Filani*, 74 F.3d 378, 385 (2d Cir. 1996); *see also People v. Cruz*, 100 A.D.2d 518 (2d Dep't 1984) ("When . . . the Trial Judge oversteps those bounds [permitting judicial examination of witnesses at trial] and assumes a prosecutorial role, there is a denial of due process and a new trial must be ordered." (cited in Ramos's *Pro Se* Br. to App. Div. at 69)).  However, this principle tends to be concerned with judicial conduct at trial, where hostility toward defense counsel or favoritism of the prosecution may inappropriately sway the jury and deprive the defendant of a fair trial.  *E.g.*, *Filani*, 74 F.3d at 385 ("[A] court exceeds its duty

33

when it becomes an advocate and asks improper questions. Where the court takes over the role of the prosecutor and displays bias, reversal is required." (citations omitted)); *United States v. Guglielmini*, 384 F.2d 602, 605 (2d Cir. 1967) (the question is whether the "trial judge's partiality to one side [reached] to the point that this became a factor in the determination of the jury"); *United States v. Birnbaum*, 373 F.2d 250, 258 (2d Cir. 1967) (noting judge's conduct is improper if, during trial, "the court failed to preserve an atmosphere of impartiality," was "discourteous or hostile" to defense counsel, or "attempted to take over or bolster the government's presentation or to undermine the defendant's case"). Ramos points to no case – much less any clearly established Supreme Court law – prohibiting a judge from denying a pretrial motion on the ground that the claim is without merit and refuted by the evidence. Therefore, the New York Court of Appeals' denial of this claim was not contrary to or an unreasonable application of Supreme Court law, and federal habeas relief is unavailable.

3. *Sixth Amendment Right to Counsel*

a. *Substitution of Counsel*

Ramos's Sixth Amendment claim is two-fold. He first contends that the court erred by substituting Rothberg for Scarpa[22] as Ramos's standby counsel without Ramos's consent and without conducting an inquiry into the relationship between Ramos and Scarpa. According to Ramos's petition, "[t]he court arbitrarily interfered with an attorney-client relationship and released his attorney without making a threshold determination whether counsel's participation presented a conflict of interest or . . . [would] compromise the orderly management of the trial or the fair administration of justice." Pet. at 16; *see also id.* ("The court severed this attorney-client relationship without making any of the mandatory threshold

---

[22]    The record indicates that Scarpa was actually Ramos's third lawyer on the case. The two lawyers who preceded him, however, are irrelevant to this issue.

finding[s] of whether the attorney's participation would have delayed or disrupted the proceedings, created any conflict of interest, or resulted in prejudice to the prosecution or the defense."). Ramos asserts that the record "failed to demonstrate that interference with the attorney-client relationship [was] justified by overriding concerns of fairness or efficiency." *Id.* "[M]ore importantly," he adds, "the petitioner never requested to have the attorney (Mr. Scarpa) relieved from his case. The court released counsel without the petitioner being present and sought no input from the petitioner on this critical issue." *Id.* The court then "appointed an attorney (Mr. Rothberg) that petitioner made abundantly clear that he did not want[] to represent him." *Id.*

The state court rejected this claim on the merits. *See Ramos*, 13 N.Y.3d at 882 ("Defendant's remaining arguments lack merit."). Accordingly, I may grant relief on this claim only if the state court's adjudication involved an unreasonable application of clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1).

"The [Sixth Amendment] right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). However, counsel may not be forced on an unwilling defendant. Criminal defendants therefore have a constitutional right to waive the assistance of counsel and represent themselves *pro se* when they "voluntarily and intelligently elect[] to do so." *Faretta v. California*, 422 U.S. 806, 807 (1975); *see also Adams v. United States ex rel. McCann*, 317 U.S. 269, 280 (1942) (to insist that a defendant accept counsel "is to imprison a man in his privileges and call it the Constitution"). When a defendant elects to proceed *pro se*, "a State may – even over objection by the accused – appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the

accused in the event that termination of the defendant's self-representation is necessary."

*Faretta*, 422 U.S. at 834 n.46.

Because a criminal defendant must waive his right to counsel before he may exercise his right to self-representation, there is no constitutional or statutory right to "hybrid representation." *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989); *accord Ennis v. LeFevre*, 560 F.2d 1072, 1075 (2d Cir. 1977), *cert. denied*, 435 U.S. 976 (1978); *United States v. Cyphers*, 556 F.2d 630, 634 (2d Cir. 1977), *cert. denied*, 431 U.S. 972 (1977). The decision of whether to permit hybrid representation – in which a defendant acts as co-counsel together with his lawyer – is thus left to the trial court's discretion. *Tutino*, 883 F.2d at 1141.

The record reflects that Ramos appeared to request hybrid representation in this case. He specifically told the judge before his first trial that he wanted to proceed *pro se* "with the exception of the argument for the DNA evidence," which he wanted Scarpa to make (11/28/05 at 3). He reiterated at the second trial that he had been "willing to proceed" if Scarpa "would handle the DNA aspect of the case" (87). When the court told him that his right to counsel was all or nothing, and the lawyering could not be split between Ramos and Scarpa, Ramos complained, "[Y]ou are putting me in a predicament where I'm not familiarized with the DNA paperwork, that's why Mr. Scarpa was going to represent that aspect of the case" (87).

Nonetheless, Ramos does not here argue that these requests for hybrid representation rendered his waiver of his right to counsel somehow invalid. Indeed, he fully admits that he unequivocally, knowingly and voluntarily waived his right to counsel. *See* Pet. at 16 ("The petitioner had been properly allowed to represent himself pro se and he recognized and understood the dangers and disadvantages of doing so."). Thus, the court's denial of his request

for hybrid representation, after properly granting Ramos *pro se* status, infringed on no federal right and fell within the trial court's discretion.

Instead, Ramos argues that the trial court violated his Sixth Amendment right to counsel of his choosing when it appointed Rothberg rather than Scarpa as his standby counsel in his retrial. The Second Circuit has specifically rejected this argument. In the first place, defendants do not necessarily have a right to standby counsel at all – the Supreme Court has simply noted that courts "may" afford such assistance. *Faretta*, 42 U.S. at 834 n.46. And indigent criminal defendants do not have a right to choose their own court-appointed lawyers, so long as they are adequately represented by attorneys appointed by the courts. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). Therefore, the Second Circuit has held that "just as [an indigent defendant] would not have been entitled to appointed counsel of his own choosing, he was not entitled to the appointment of a standby of his own choosing." *United States v. Mills*, 895 F.2d 897, 904 (2d Cir. 1990) (citations omitted); *see also United States v. Webster*, 84 F.3d 1056, 1063 (8th Cir. 1996) ("Appointment of standby counsel is within the discretion of the district court, and a *pro se* defendant does not enjoy an absolute right to standby counsel. It necessarily follows that a defendant does not have a right to standby counsel of his own choosing."). In fact, a defendant has no right to a particular standby counsel even where the trial court's denial of the defendant's request for a particular standby counsel appears unjustified. *Mills*, 895 F.2d at 904. Thus, "[i]t was within the discretion of the court to appoint someone other than [Scarpa]" as standby counsel at the second trial. *Id.*

Given that Ramos does not contend that he was improperly accorded *pro se* status, the trial court's denial of standby counsel of his own choosing did not violate any federal right of Ramos's, and the state court's decision denying relief on this claim was not an

unreasonable application of clearly established Supreme Court law. Accordingly, there can be no relief on this claim.

        b.     *Interference with* Pro Se *Self-Representation*

The second part of Ramos's Sixth Amendment claim is that the state court inappropriately interfered with his right to *pro se* self-representation. Ramos asserts in his petition that he knowingly waived the right to counsel and the court properly granted him *pro se* status. Pet. at 16. However, Ramos argues that the trial court wrongfully revoked his *pro se* status by ordering Rothberg to act as his attorney once Ramos absented himself from the trial. Ramos's petition states that the court "destroy[ed]" his right to proceed *pro se* by "appoint[ing] an attorney to represent [him] against his clearly expressed wishes." *Id.* Even though the court later changed its mind and, while jury selection was still ongoing, re-introduced Rothberg to the jury as Ramos's "legal advisor" (90-91), the court had already "presented Mr. Rothberg to the jury panel as petitioner's lawyer." Pet. at 17. Thus, "the damage had been done," because "whatever strategy [Ramos] may have had [in electing to proceed *pro se* and then absenting himself] was destroyed when Mr. Rothberg was presented to the jury panel" as Ramos's attorney. *Id.* Ramos states that he "chose to absent himself from the proceedings beca[]use he believed the trial was unfair." *Id.* He explains that his decision may have been a strategic effort to induce "the jury to have a reasonable doubt about the case as a result of observing no defendant or attorney at the defense table." *Id.* at 17. Ramos argues that the trial court undermined that strategy when it improperly interpreted his decision to absent himself from the trial as a waiver of his right to proceed *pro se*. *Id.* at 16.

        Although the Second Circuit has suggested in dicta that a *pro se* defendant who is *involuntarily* removed from the courtroom as a result of his misconduct must be provided with

replacement counsel in his absence, *see Davis v. Grant*, 532 F.3d 132, 144-45 (2d Cir. 2008); *cf. Illinois v. Allen*, 397 U.S. 337, 340-41 (1970), this rule does not extend to the situation here – where Ramos *voluntarily* absented himself from the proceedings by deliberate choice. The Second Circuit has held that a *pro se* defendant's conscious strategic decision to absent herself from the courtroom does not invalidate her otherwise knowing and voluntary waiver of counsel. *See Clark v. Perez*, 510 F.3d 382, 392 (2d Cir. 2008). In other words, a decision to proceed *pro se* is not necessarily inconsistent with a decision not to participate in the proceedings. *Torres v. United States*, 140 F.3d 392, 402 (2d Cir. 1998). Thus, there is no constitutional prohibition on an empty defense table – provided both that the waiver of counsel was valid and that the decision not to be present in the courtroom is intentional and strategic. *Clark*, 510 F.3d at 392. In general, "once a defendant has knowingly and intelligently waived [his] right to counsel, [the trial] court should not interfere with the defendant's choice, even though it 'may sometimes seem woefully foolish to the judge.'" *Torres*, 140 F.3d at 402 (quoting *United States v. Curcio*, 694 F.2d 14, 25 (2d Cir. 1982)).

Accordingly, the trial court's initial decision to install counsel for Ramos against his wishes simply because Ramos voluntarily absented himself from the courtroom was likely in error.[23] Although a court may appoint standby counsel to aid a *pro se* defendant, *Faretta*, 422 U.S. at 834 n.46, standby counsel's participation should not encroach on the *pro se* defendant's "core" right "to preserve actual control over the case he chooses to present to the jury." *McKaskle v. Wiggins*, 465 U.S. 168, 178 (1984). Further, "participation by standby counsel

---

[23]     Because I conclude below that this error was harmless, I do not address whether the state court's failure to find that it occurred constituted an unreasonable application of clearly established Supreme Court law – the standard for granting relief under AEDPA given that the state court rejected Ramos's Sixth Amendment claims on the merits in his direct appeal. *See* 28 U.S.C. § 2254(d)(1); *Ramos*, 13 N.Y.3d at 882 ("Defendant's remaining arguments lack merit."). I am mindful that the question before me "is not whether . . . the state court's determination . . . was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 129 S. Ct. 1411, 1420 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself." *Id.* Under this standard, it is apparent that the trial court's introduction of Rothberg to the jury as "the attorney for the defendant" (28) destroyed the perception that Ramos was representing himself and therefore encroached on Ramos's *pro se* right. *See People v. Smith*, 68 N.Y.2d 737, 739 (1986) (vacating conviction where "trial court rejected, out of hand, defendant's timely request to proceed *pro se*," and then "compelled assigned counsel to participate and to take specific actions with respect to the conduct of the trial . . . despite defendant's contrary directions and repeated objections"). The introduction of Rothberg as Ramos's "attorney" also undermined Ramos's control over the presentation of his case by eliminating whatever appearance of inquest or injustice Ramos was hoping to portray by his absence. The Supreme Court has recognized that "the right to appear *pro se* can lose much of its importance if only the lawyers in the courtroom know that the right is being exercised." *McKaskle*, 465 U.S. at 178-79. This note rings especially true here, where Ramos's entire strategy – to the extent he had one – depended on upholding the appearance of a rigged, one-sided system that runs roughshod over criminal defendants' rights.

Nonetheless, I am constrained to conclude that this error was harmless. Even where constitutional error has occurred, and even where it is egregious enough to survive AEDPA deference, federal habeas relief is warranted only where the error had a "substantial and injurious effect" on the jury's verdict. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)); *see also Wood v. Ercole*, 644 F.3d 83, 93-94 (2d Cir. 2011). Here, Rothberg was introduced as Ramos's lawyer during a single round of jury selection (28). Aside from greeting the jury (28), Rothberg said nothing further before or to the jury. Further, the state court corrected its error while jury selection was still ongoing, telling the

jury after lunch that Rothberg "has been appointed by the Court to be available to serve as a legal advisor to Mr. Ramos" (90-91). After that, Rothberg did nothing more than sit behind the rails in the audience and observe (89). The jury was instructed during voir dire and again during jury instructions not to speculate on or draw any inferences from Ramos's absence from the courtroom (93, 329). The prosecutor specifically discussed with jurors during voir dire whether any of them would feel uncomfortable convicting the defendant when "there is no one at that [defense] table" (92). A couple jurors asked why he was not there and whether he would be absent during the entire trial, and they were told not to speculate on those questions (93-94). Thus, beginning as early as voir dire, the trial proceeded roughly as it would have if the judge had scrupulously honored Ramos's strategy of having a conspicuously empty defense table throughout trial.

Moreover, even if Ramos's strategy had been executed perfectly, the evidence against him was overwhelming and would have been left unrebutted and un-cross-examined. All of the potential jurors agreed during voir dire that they would convict the defendant if the evidence proved him guilty beyond a reasonable doubt, regardless of whether he was present in the courtroom or not (93-94). Because the evidence was in fact overwhelming – including testimony that Ramos's DNA profile matched the DNA profile of the semen from A.V.'s rape kit and would be found only once in a population of "five zeros greater than a trillion" – or, in other words, in "160 planet Earths" (313) – the proof of Ramos's guilt was in fact established beyond a reasonable doubt, leading the jury to convict Ramos even if he had successfully absented himself without representation for the entire proceedings. Accordingly, this claim does not warrant habeas relief.

4.      *Improper Delegation of a Judicial Function to a Nonjudicial Officer*

Ramos states in his petition that his "right to a jury trial under the supervision of a judge was denied when the court repeatedly used the court clerk to question him about whether or not he wished to return to the courtroom and exercise his right to be his own lawyer and participate in his trial and also to instruct and advise him on the right that he would be forfeiting." Pet at 17; *see also id.* ("[T]he court repeatedly had the clerk read the instructions that the court had prepared informing the petitioner of the various legal right[s] that he would be sacrificing if he did not return to the court."). Ramos argues that "[t]he court's delegation of this judicial function deprived petitioner of his right to trial by jury under the supervision of a judge," because he "was present in the holding cells just adjacent to the courtroom and the whole procedure could have been easily effectuated," and "[m]oreover, the court had ordered the petitioner brought in by force . . . against his wishes on several previous occasions so it is odd that the judge suddenly changed his mind and invoked an alternative procedure which involved a judicial proxy but which did not comply with the law." Pet. at 18.

The state court denied this claim on the merits. *See Ramos*, 13 N.Y.3d at 882 ("Defendant's remaining arguments lack merit."); *see also Ramos*, 61 A.D.3d at 783-84 ("[U]nder the circumstances of this case, where the defendant waived his right to be present at trial and refused to leave the court confinement pens, the court did not delegate an essential judicial function to a court clerk when, at the court's direction, the clerk explained to the defendant his right to be present and informed him that the trial would continue in his absence."). Accordingly, I review this claim under AEDPA's deferential standard of review, and may grant relief only if the state court's denial was contrary to or involved an unreasonable application of clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1). I have not located, and Ramos has not directed me to, any Supreme Court law addressing the question presented here –

namely, whether a court which has already obtained a waiver from the defendant of his right to be present, and personally informed him in open court that he may return at any time, must either force the defendant to come to court against his will each day of the trial to apprise him of the status of the trial and remind him of his right to return at any time, or go into the holding pens and personally provide such an admonition. Because there is no Supreme Court law even addressing this question, the state court's adjudication could not have been contrary to or an unreasonable application of such law.

It is true that the Supreme Court has made "sweeping statements that 'trial by jury' requires 'a jury of 12 men in the presence and under the superintendence of a judge.'" *United States v. Grant*, 52 F.3d 448, 450 (2d Cir. 1995) (quoting *Capital Traction Co. v. Hof*, 174 U.S. 1, 13 (1899)). However, these cases merely require a judge to oversee the "functional proceedings" of the trial. *Id.* at 449. For example, a defendant may insist that a judge rather than a justice of the peace preside over his trial, *Capital Traction*, 174 U.S. at 45-46, a court should not substitute one judge for another midway through a criminal trial, *Freeman v. United States*, 227 F. 732, 743-44, 759 (2d Cir. 1915), and a judge should not leave the room while counsel is making objections addressed to the judge, *People v. Parisi*, 276 N.Y. 97, 100 (1937). Nor should a judge delegate to his law secretary his duty to respond to inquiries from the jury. *See People v. Ahmed*, 66 N.Y.2d 307 (1985). Yet a judge need not oversee portions of the trial where his presence would "serv[e] only to satisfy symbolic ritual." *Grant*, 52 F.3d at 449. Thus, a judge does not commit error by exiting the courtroom during a readback of testimony to the jury without objection by either side. *Id.* at 451. Nor does a judge commit error by "sending defense counsel to explain to defendant his right to be present and inform him that the proceedings would continue in his absence if he waived that right" when a defendant refuses to

be produced in the courtroom, so long as the court itself determines whether defendant has in fact waived his right to be present. *People v. Coppin*, 55 A.D.3d 374, 375 (1st Dep't 2008). And a court "properly exercised its discretion when, citing potential danger to court and Department of Correction personnel, it declined to order defendant forcibly produced for the purpose of advising him of his right to be present and securing an express waiver of that right." *Id.*

Here, the court expressly informed Ramos of his right to be present and persisted in explaining the ramifications of waiving that right. On the first day of the retrial, the following exchange occurred:

THE COURT:      Do you understand by not participating in the case not being in the courtroom you don't have the opportunity –

RAMOS:          I do not wish for this lawyer, I don't even know his name.

THE COURT:      Do you understand that you will not have the opportunity to consult counsel by being outside the courtroom?

RAMOS:          I do not wish him to represent me. I want Mr. Scarpa.

THE COURT:      Are you going to answer my question? Do you understand by not being here you can't observe and confront the witnesses against you, do you understand that?

RAMOS:          Your Honor –

THE COURT:      Do you understand that?

RAMOS:          I definitely understand that . . . .

(8-9). And the court followed it up by saying:

When you go back out of this courtroom and go back there, you will not have the opportunity to do the things that I just mentioned regarding assisting your attorney, confronting the witnesses against

44

you, and participating in the trial to that extent. You will be advised everyday what's going on, and you will be given the opportunity to come back out just as you were the last time, but once you are out of the courtroom, you give up all these rights because you are not here.

(11-12). Later that afternoon, the court issued a force order and required Ramos again to appear in court. The court said, "[Y]ou indicated your desire not to be present in the courtroom during the course of the trial," to which Ramos responded, "It is a right I'm supposed to have if I do not wish to participate" (83). The court then warned Ramos that "if we proceed in that fashion," that is, with Ramos representing himself and yet not being present, "there will be nobody here to represent your interests in terms of a body" (84). Ramos said he was "willing already to get convicted" (84). The court then told Ramos that "[i]f you change your mind, we will resume at whatever point you choose to do that if you choose to do that" (89).

The next day the court again insisted that Ramos appear. Ramos said he did "not want to come into the courtroom" (145). He elaborated, "I already put on the record I do not wish to participate in no part of this trial. That should be good enough on record. You don't need to call me out here everyday" (146). Ramos then said nothing further, and the court said, "It is abundantly clear the defendant is not cooperating. Even though the court is attempting to communicate with him he is adamantly refusing to respond in a civil fashion . . . " (147). It was only on the third, fourth, and fifth days of trial that the court implemented the "alternative method" to send the clerk to ask Ramos whether he would come to court, and if he said no, to inform him of the status of the trial and the rights he was forfeiting by being absent. Because Ramos had already waived his right to be present both expressly in his statements to the court and implicitly through his continuing absence, and had been repeatedly informed by the court of the rights he was thereby giving up, the court's sending the clerk to remind him of those rights

each day and inquire whether he would like to attend was not a delegation of a judicial duty, but rather an attempt to maximize Ramos's opportunity to be involved while simultaneously respecting his voluntary decision not to be present in court.

In sum, the court's method of sending the court clerk to remind Ramos of the rights he was continuing to forfeit by being absent did not delegate any judicial duty, and the state court's denial of this claim on the merits was neither contrary to nor an unreasonable application of clearly established Supreme Court law.

5. *Sentencing as a Persistent Felony Offender Violated Due Process and Double Jeopardy Rights*

Ramos was sentenced as a Persistent Felony Offender ("PFO") pursuant to New York Penal Law § 70.10. In his petition to this court, Ramos objects to his sentencing as a PFO on two grounds: (1) he was "denied due process of law when the mandated procedures for sentencing a persistent felony offender were not followed," because the "People were not put to their burden and standard of proof"; and (2) he was "twice put in jeopardy of life or limb where the same prior convictions used to sentence him as a persistent felony offender were again used to sentence him, for a second time, a persistent felony offender." Pet. at 19 (capitalization removed).

A panel of the Second Circuit recently explained New York's PFO sentencing scheme:

> There are three increasingly harsh levels of sentencing applicable to felony offenders under Article 70 of New York's penal laws pertinent to this appeal. First-time felony offenders are generally sentenced according to indeterminate ranges based on the class of offense. *See* N.Y. Penal Law § 70.00. Second felony offenders are subject to enhanced sentences, based solely upon the finding of one qualifying prior felony conviction, again according to the class of offense. *See id.* § 70.06. Under the PFO statute, a defendant who has been previously convicted of two felonies is a "persistent

> felony offender" (sometimes "PFO"). *See id.* § 70.10(1)(a). PFO's
> may be sentenced to an indeterminate sentence in the range
> authorized for Class A-I felony offenders rather than the range
> authorized for the class of the defendant's actual offense. *See id.* §
> 70.10(2); *see also* N.Y. Crim. Proc. Law § 400.20(1)(b). Class A-I
> felonies carry a minimum sentence of 15 years and a maximum of
> life. *See* N.Y. Penal Law §§ 70.00(2)(a), 70.00(3)(a)(i).

*Besser v. Walsh*, 601 F.3d 163, 169-70 (2d Cir. 2010) (footnotes omitted), *decision vacated in part*, *Portalatin v. Graham*, 624 F.3d 69 (2010) (en banc).[24]

Ramos's designation as a PFO substantially enhanced Ramos's maximum sentence, elevating it from a prison term of 25 years to a term of life. *See* N.Y. Penal Law § 70.00(2)(a)-(b); 70.10(b). The court held a hearing on February 22, 2006, to determine whether Ramos was a PFO and, if so, whether a PFO sentence should be imposed (PFO Trans. at 4). The government supplied two certificates of conviction to establish (1) a June 6, 1984, conviction for third-degree burglary and second-degree attempted burglary, for which Ramos was sentenced to 2 to 6 years in prison; and (2) an August 3, 1989, conviction for third-degree burglary, for which Ramos was sentenced to 42 months to 7 years in prison (PFO Trans. at 15). In addition to these two felony convictions, the court considered "[a]dditional considerations that demonstrate the defendant's history and character and nature and circumstances of his criminal conduct warrant a persistent felony offender sentence," including: (1) a September 1, 1977, youthful offender adjudication for criminal trespass and petit larceny; (2) a March 10, 1987, conviction for criminal trespass; and (3) an October 31, 1988, conviction for third-degree assault (PFO Trans. at 16-17). The court concluded that "in view of the foregoing and under the circumstances presented the defendant will be sentenced as a persistent felony offender" (PFO Trans. at 17).

---

[24]     Thus, New York's PFO statute is a "discretionary" persistent felony offender statute, because "[i]t permits, but does not require, a class A-I sentence for certain recidivist felons." *Portalatin*, 624 F.3d at 74. By contrast, New York imposes a *mandatory* enhanced sentence on persistent *violent* felony offenders, who are defined as persons who stand convicted of a violent felony, as defined in N.Y. Penal Law § 70.02, and have previously been convicted of two or more violent felonies, as defined in N.Y. Penal Law. §70.04(1)(b). *See id.* at 73-74.

Ramos objected at the PFO hearing on four grounds: (1) he did not receive "notice" of the February 22 PFO hearing as required by N.Y.C.P.L. § 400.20(4), although he admitted he had personally received a copy of the court's February 1 order setting and describing the upcoming February 22 PFO hearing (PFO Trans. at 6, 8-10); (2) he wished to controvert his 1984 convictions because he lost a trial on only one of the charges, and only pleaded guilty on the second charge because his lawyer advised him that the sentences would run concurrently;[25] then his lawyer never appealed the convictions though he said he would (PFO Trans. at 6); (3) he could not be sentenced as a PFO because he had already been sentenced as a PFO in 1997, and he had not committed any more crimes since then (PFO Trans. at 6-7, 11); and (4) it didn't make sense that he would be sentenced as a "persistent" felony offender for a 1993 crime, because he had been sentenced only as a "predicate" offender for a crime in 1994 (PFO Trans. at 6-7, 10-11).  However, he admitted that he was "not contesting" the 1989 conviction (PFO Trans. at 7).

At the conclusion of sentencing arguments, the court sentenced Ramos to an indeterminate prison term of 25 years to life on each of the four counts of conviction, to be served concurrently with each other and consecutively to any undischarged term or sentence Ramos was already serving (PFO Trans. at 30-31).  Prior to announcing its judgment, the court said,

> The crimes committed against the complainant in this case aside from being extremely violent by their very nature were among the most vicious and uncaring acts of aggression that this court has ever encountered.  This defendant previously has been determined to be a second felony offender by this court.  His criminal history at the time of the commission of the crimes in this indictment was extensive.  Beginning in the latter part of the '70s extending through the '80s and continuing soon after release from incarceration with the rape, sodomy and robbery in 1993 that resulted in conviction here.  Defendant reveals absolutely no

---

[25] Ramos says he pled to the second charge because he was told they would run "consecutive" (PFO Trans. at 6), but I believe he means they would run concurrently.

> feelings of guilt or sense of remorse. Clearly there has been no
> rehabilitation after past incarcerations the periods of which
> increased with each felony conviction.
>
> One of the purposes of a penal sanction is societal
> protection. This case and this defendant's criminal history cry out
> for the imposition of the maximum period of incarceration.

(PFO Trans. at 30).

    a.    *Due Process*

Ramos argues in his habeas petition that he was "denied due process of law" because "the mandated procedures for sentencing a persistent felony offender were not followed" – in particular, "[t]he People were not put to their burden and standard of proof." Pet. at 19. Ramos fleshes out this position in his reply, in which he writes, "the court just relied on the certificate convictions submitted by the People for the 1984 and 1989 convictions. . . . Here, the People were not put to their burden and standard of proof. As a matter of fact, the record is devoid and silent in argument. The petitioner was thus sentenced in violation of due process of law because the burden and standard of proof was never met for sentencing petitioner as a persistent felony offender." Reply Br. at 94-95.

The New York Court of Appeals denied this claim as procedurally barred. *See Ramos*, 13 N.Y.3d at 882 ("Defendant's contention[] . . . that his sentencing as a persistent felony offender violated due process of law [is] not preserved for review."). Accordingly, if this ruling constitutes an independent and adequate state law ground, I may not consider the claim on habeas review, absent a showing of cause and prejudice. Nonetheless, I need not decide this question, because I conclude the claim is without merit in any event.

New York Criminal Procedure Law § 400.20 prescribes the procedure for determining whether a defendant should be sentenced as a persistent felony offender pursuant to New York Penal Law § 70.10. It provides that a persistent felony offender sentence

> may not be imposed unless, based upon evidence in the record of a hearing held pursuant to this section, the court (a) has found that the defendant is a persistent felony offender as defined in [N.Y. Penal Law § 70.10], and (b) is of the opinion that the history and character of the defendant and the nature and circumstances of his criminal conduct are such that extended incarceration and lifetime supervision of the defendant are warranted to best serve the public interest.
>
>> . . . .
>
>> . . . Upon any hearing held pursuant to this section the burden of proof is upon the people. A finding that the defendant is a persistent felony offender . . . must be based upon proof beyond a reasonable doubt by evidence admissible under the rules applicable to the trial of the issue of guilt. Matters pertaining to the defendant's history and character and the nature and circumstances of his criminal conduct may be established by any relevant evidence, not legally privileged, regardless of admissibility under the exclusionary rules of evidence, and the standard of proof with respect to such matters shall be a preponderance of the evidence.

N.Y.C.P.L. § 400.20(1), (5).

The government provided evidence of Ramos's prior convictions by providing certificates of conviction to the court. Ramos did not contest either the accuracy of the certificates or the fact of those convictions. This constituted proof beyond a reasonable doubt of Ramos's two prior convictions. Accordingly, Ramos's claim that the government did not carry its burden of proof simply because the government did not make oral arguments in support of its position at the hearing is without merit.

b.      *Double Jeopardy*

On June 25, 1997, Ramos was convicted after a bench trial of robbery in the third degree and criminal possession of stolen property in the fifth degree, arising from his forcible stealing of a bicycle. *See People v. Ramos*, 254 A.D.2d 373 (2d Dep't 1998). The court sentenced him as a persistent felony offender, and the designation and sentence were upheld on appeal. *Id.* at 374; *see also People v. Ramos*, 92 N.Y.2d 985 (1998) (denying leave to appeal).

According to Ramos, this 1997 PFO sentence relied on three prior felony convictions as predicates: (1) the 1984 convictions for burglary and attempted burglary; (2) the 1989 conviction for burglary; and (3) a 1994 conviction for attempted burglary in the third degree, for which he was sentenced to a term of 1.5 to 3 years (*see* Ramos's *Pro Se* Br. to App. Div. at 75). Ramos indicates he was adjudicated a "second felony offender" in 1994 (*see* Ramos *Pro Se* Letter to N.Y. Ct. App. at 21-22).

Ramos appears to object that the same predicate felonies that supported his 1997 PFO designation were also used by the judge in this case to adjudicate him a PFO. He says in his petition, "it is petitioner's believe [sic] that collateral estoppel should have forbidden the re-litigation of the same prior convictions that were used in 1997, to have appellant adjudicated a persistent felony offender for a second time." Pet. at 19. In his letter to the New York Court of Appeals, Ramos explained this objection by saying "[t]here was no dispute that these same convictions were again being used to sentence appellant a persistent felony offender for a second time. . . . The fact of the matter is, that if appellant had been sentence[d] in 1993 as a persistent felony offender, he does not get sentenced in 1997 as a persistent felony offender" (Ramos *Pro Se* Letter to N.Y. Ct. App. at 20). And in his *pro se* brief to the Appellate Division, Ramos wrote, "The 1997 findings were the same convictions that were again used in 2006 to adjudicate appellant a persistent felony offender a second time" (Ramos *Pro Se* Br. to App. Div. at 76).

The New York Court of Appeals denied this claim on the merits. *See Ramos*, 13 N.Y.3d at 882 ("Defendant's remaining arguments lack merit.").[26] Accordingly, I may review its merits only under AEDPA's deferential standard of review, and grant habeas relief only if the

---

[26]     Ramos presented this claim to the New York Court of Appeals (*see* Ramos *Pro Se* Letter to N.Y. Ct. App. at 20-22).

Court of Appeals' decision was contrary to or an unreasonable application of clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1).

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This provision protects against successive prosecutions for the same offense after acquittal or conviction and against multiple criminal punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989).

"[A]s the Supreme Court has held on numerous occasions, repeat offender provisions like those in the New York Penal Law do not implicate the Double Jeopardy Clause." *Parks v. Hollins*, No. 00-CV-4587(JG), 2002 WL 1159885, at *3 (E.D.N.Y. May 7, 2002) (citing *Spencer v. Texas*, 385 U.S. 554, 560 (1967)); *see also Caspari v. Bohlen*, 510 U.S. 383, 391 (1994) ("[I]t [i]s well established that there is no double jeopardy bar to the use of prior convictions in sentencing a persistent offender."); *Adelman v. Ercole*, No. 08 CV 3609(RJD), 2010 WL 3210718, at *4 (E.D.N.Y. Aug. 12, 2010) ("[T]he Double Jeopardy Clause [is not] implicated by petitioner's enhanced sentence."); *United States v. Leo*, 706 F. Supp. 2d 544, 549 n.6 (S.D.N.Y. 2010) ("[E]nhancing [a defendant]'s offense level based on the prior conviction does not raise double jeopardy concerns."). Sentencing enhancements based on prior convictions are considered punishments only for the manner in which the defendant committed the crime of conviction – not additional punishments for the prior offenses. *See Monge v. California*, 524 U.S. 721, 728 (1998); *United States v. Watts*, 519 U.S. 148, 154 (1997); *Witte v. United States*, 515 U.S. 389, 399 (1995); *Nichols v. United States*, 511 U.S. 738, 747 (1994) (noting that repeat-

offender laws "penaliz[e] only the last offense committed by the defendant" (internal quotation marks omitted)).

It does not violate double jeopardy principles for a defendant's sentence to be enhanced for conduct for which the defendant was previously prosecuted. *See Williams v. Oklahoma*, 358 U.S. 576, 586 (1959). And conduct used to enhance a defendant's sentence in one case may also be used to enhance the sentence in a second case. *United States v. McCormick*, 58 F.3d 874, 879 (2d Cir. 1995). Double Jeopardy protections are inapplicable to classifications under felony offender schemes "because the determinations at issue do not place a defendant in jeopardy for an 'offense.'" *Monge*, 524 U.S. at 728 (citing *Bullington v. Missouri*, 451 U.S. 430, 438 (1981)); *see also Williams v. New York*, 367 F. Supp. 2d 449, 457 (W.D.N.Y. 2005) ("[A] defendant's classification under the felony offender sentencing scheme is not a separate 'offense.'"); *People v. Sailor*, 65 N.Y.2d 224, 233 (1985) ("Classification as a persistent felony offender . . . is not a separate offense and sentencing under the persistent felony offender and second felony offender statutes does not change the class of the underlying conviction." (internal quotation marks and alterations omitted)).

Moreover, persistent felony offender sentencing in New York is discretionary, and there is no requirement that a court *must* sentence a defendant as a persistent felony offender at every conceivable opportunity or forever forfeit the option. *See Adelman*, 2010 WL 3210718 at *4 (rejecting contention that previous sentencing judge's erroneous failure to enhance sentence for repeat offender status barred current sentencing judge from sentencing as persistent violent felony offender, where there was "no dispute that petitioner had two prior violent felony convictions at the time of his instant sentencing" (emphasis omitted) (citing *People v. Carr*, 244 A.D.2d 264 (1st Dep't 1997) (holding that the fact that defendant was not sentenced on his

second violent felony conviction did not prevent trial judge from sentencing defendant as a persistent violent felony offender under § 70.08))).  Thus, the state court's failure to sentence Ramos as a PFO for a 1994 crime did not disable the judge in this case from sentencing Ramos as a PFO for this 1993 crime.

There is no dispute that Ramos had two prior felony convictions at the time he committed his 1993 crime for which he was sentenced in this case.  Accordingly, his sentence as a persistent felony offender accorded with N.Y. Penal Law § 70.10 and did not implicate Double Jeopardy concerns, regardless of whether his 1984 and 1989 convictions twice served as predicate felonies for adjudicating him as a persistent felony offender (in judgments for crimes occurring in 1993 and 1997), and regardless of the fact that a trial judge failed to sentence him as a persistent felony offender for a 1994 crime.

## CONCLUSION

For the reasons stated above, Ramos's petition for habeas corpus pursuant to 28 U.S.C. § 2254 is denied.[27]  Because I conclude that Ramos has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.  *See* 28 U.S.C. § 2253(c).

---

[27]       As noted above, Ramos mentioned at oral argument that he has a pending § 440 motion in state court.  I have considered whether to deem Ramos's petition amended to include the claims raised in his state-court § 440 motion and then stay and abey his petition while he exhausts those claims.  However, I conclude that the factors set forth in *Rhines v. Weber*, 544 U.S. 269, 277-78 (2005), which circumscribe my discretion to employ the "stay and abeyance" procedure, are not satisfied here.  First, Ramos has not demonstrated good cause for his failure to exhaust these claims first in state court before filing his federal petition.  Second, Ramos's claims, as he described them at oral argument, appear plainly meritless.  Ramos was unable to articulate what relevance any purported unauthorized entry into his home and surreptitious DNA sampling in 1996 may have had on his conviction for this crime, which was predicated on the DNA obtained from his 2001 swabbing. Nor did Ramos indicate the nature of his *Brady* claim or describe what evidence the government allegedly suppressed in this case, besides referencing the same 1996 home entry.  Finally, I do not understand Ramos's purported "fraud on the court" claim to carry any independent meaning beyond reiterating his complaints regarding the 1996 home entry and/or the statute of limitations violation.  Therefore, because I do not find that the *Rhines* factors are satisfied here, I deny Ramos's petition without holding it in abeyance pending the resolution of his state-court § 440 motion.

So ordered.


John Gleeson, U.S.D.J.

Dated: January 4, 2012
      Brooklyn, New York